BRIEF FOR APPELLEE

_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

NO. 11-4054(L); 11-5133
_____

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL DEFONTE BERNARD,
BRADLEY MAURICE JAMES

Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

_____

BRIEF OF THE UNITED STATES

_____

THOMAS G. WALKER
United States Attorney

BY:  JENNIFER P. MAY-PARKER
YVONNE V. WATFORD-MCKINNEY
Assistant United States Attorneys
310 New Bern Avenue
Suite 800
Raleigh, North Carolina 27601
Telephone:  (919) 856-4530

Attorneys for Appellee

_____
_____

TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . iii

STATEMENT OF JURISDICTION.. . . . . . . . . . . . . . . 1

STATEMENT OF ISSUE. . . . . . . . . . . . . . . . . . . 2

STATEMENT OF CASE.. . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . 6

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . 40

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . 42

     I.   THE DISTRICT COURT DID NOT PLAINLY ERR WHEN IT
          FOUND BERNARD MENTALLY COMPETENT TO REPRESENT
          HIMSELF AT TRIAL. . . . . . . . . . . . . . . . 42

          A.   Standard of Review . . . . . . . . . 42

          B.   Discussion of Issue. . . . . . . . . 42

     II.  DEFENSE COUNSEL WAS NOT INEFFECTIVE IN FAILING
          TO CITE THE CORRECT LEGAL STANDARD TO
          DETERMINE BERNARD'S COMPETENCY TO REPRESENT
          HIMSELF.. . . . . . . . . . . . . . . . . . . 51

          A.   Standard of Review.. . . . . . . . . 51

          B.   Discussion of Issue. . . . . . . . . .

    III. JAMES' SENTENCE WAS PROCEDURALLY REASONABLE.. . . . 53

          A.   Standard of review.. . . . . . . . . 53

          B.   Discussion of Issue. . . . . . . . . 53

     IV.  DEFENSE COUNSEL WAS NOT PLAINLY INEFFECTIVE
          WHEN HE DID NOT REQUEST A BELOW-GUIDELINES
          SENTENCE AND WHEN HE DID NOT REQUEST A
          DOWNWARD VARIANCE.. . . . . . . . . . . . . . 56

          A.   Standard of Review.. . . . . . . . . 56

          B.   Discussion of Issue. . . . . . . . . 56

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . .  60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

TABLE OF AUTHORITIES

CASES

<u>Dusky v. United States</u>, 362 U.S. 402 (1960).. . . . . . . . 43, 49

<u>Faretta v. California</u>, 422 U.S. 806 (1975). . . . . . . . . . 43

<u>Godinez v. Moran</u>, 509 U.S. 389 (1993).. . . . . . . . . . passim

<u>Hall v. United States</u>, 410 F.2d 653 (4th Cir. 1969).. . . . . 49

<u>Indiana v. Edwards</u>, 554 U.S. 164 (2008).. . . . . . . . . passim

<u>Lawrence v. Branker</u>, 517 F.3d 700 (4th Cir. 2008).. . . . . . 58

<u>McKaskle v. Wiggins</u>, 465 U.S. 168 (1984). . . . . . . . . . . 46

<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).. . . . . . . . . . . 20

<u>Newfield v. United States</u>, 565 F.2d 203 (2d Cir. 1977). . . . 49

<u>Rita v. United States</u>, 551 U.S. 338 (2007). . . . . . . . . . 54

<u>Strickland v. Washington</u>, 466 U.S. 668 (1984).. . . . . . . passim

<u>United States v. Ahrendt</u>, 560 F.3d 69 (1st Cir. 2009).. . . . 50

<u>United States v. Baldovinos</u>, 434 F.3d 233
    (4th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . passim

<u>United States v. Banks</u>, 482 F.3d 733 (4th Cir. 2007). . . . . 51

<u>United States v. Baptiste</u>, 596 F.3d 214
    (4th Cir. 2010).. . . . . . . . . . . . . . . . . . . . . passim

<u>United States v. Booker</u>, 543 U.S. 220 (2005). . . . . . . . . 53

<u>United States v. Carter</u>, 564 F.3d 325 (4th Cir. 2009).. . . . 54

<u>United States v. DeShazer</u>, 554 F. 3d 1281
    (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 44

<u>United States v. Garrett</u>, 903 F.2d 1105
    (7th Cir. 1990).. . . . . . . . . . . . . . . . . . . . 49, 50

iii

United States v. James, 439 F. App'x 219
    (4th Cir.), cert. denied, 132 S. Ct. 790 (2011)
    (unpublished) . . . . . . . . . . . . . . . . . . . . . 4, 37

United States v. Ladoucer, 573 F.3d 628
    (8th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 47

United States v. Martinez, 136 F.3d 972
    (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . 52, 57

United States v. Mason, 52 F.3d 1286 (4th Cir. 1995) . . . . . 49

United States v. Mendoza-Mendoza, 597 F.3d 212
    (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . 53

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . 42, 43

United States v. Patterson, 140 F.3d 767
    (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 47

United States v. Turner, 644 F.3d 713 (8th Cir. 2011) . . . . . 50

United States v. Vamos, 797 F.2d 1146
    (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . 49-50, 51

United States v. Young, 470 U.S. 1 (1985) . . . . . . . . . . . 43

STATUTES

18 U.S.C. § 922(g) . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 924 . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . 36, 54

18 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 4241 . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 4241(a) . . . . . . . . . . . . . . . . . . . . . . 49

18 U.S.C. § 4241(d) . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 4242(d) . . . . . . . . . . . . . . . . . . . . . . . 4

iv

21 U.S.C. § 841(a)(1)............................ 3, 32

21 U.S.C. § 846................................ 3

28 U.S.C. § 1291............................. 11

<u>RULES</u>

Fed. R. Crim. P. 29......................... 25

<u>SENTENCING GUIDELINES</u>

USSG §2D1.1(c)(7)........................ 32

USSG §2K2.13............................ 33

USSG §4A1.1............................. 32

USSG §4A1.1(d)......................... 32

USSG §4A1.1(e)......................... 32

v

## STATEMENT OF JURISDICTION

Defendant Michael Defonte Bernard appeals from a judgment of conviction following a trial. Jurisdiction to the district court was established by 18 U.S.C. § 3231.

Jurisdiction to this Court is provided by 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The judgment was entered on January 12, 2011, and the defendant timely filed a notice of appeal on January 12, 2011.

Defendant Bradley Maurice James appeals from an amended judgment upon re-sentencing. Jurisdiction to the district court was established by 18 U.S.C. § 3231.

Jurisdiction to this Court is provided by 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The amended judgment was entered on November 23, 2011, and the defendant filed a timely notice of appeal on November 15, 2011.

<u>STATEMENT OF ISSUES</u>

1.    Whether the district court plainly erred when it found Bernard mentally competent to represent himself at trial.

2.    Whether defense counsel's representation was plainly ineffective when he incorrectly cited the legal standard for determining Bernard's mental competency to represent himself at trial.

3.    Whether James' sentence was procedurally unreasonable.

4.    Whether James' defense counsel was plainly ineffective when he requested a sentence at the bottom of the advisory guidelines range and did not request a variance based upon post-sentencing rehabilitation.

<u>STATEMENT OF CASE</u>

On April 22, 2009, defendants Michael Defonte Bernard and Bradley Maurice James were named in a six-count indictment charging them with various controlled substances and firearms offenses. (J.A. 41-45). Specifically, both defendants were charged in Counts 1 and 5 with conspiracy to distribute and possess with intent to distribute more than 50 kilograms of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. § 846; and aiding and abetting each other in the possession with intent to distribute more than 50 kilograms of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1). (J.A. 41, 43). Additionally, defendant Bernard was charged in Count 2 with possession with intent to distribute a quantity of cocaine base (crack), a Schedule II controlled substance, and a quantity of marijuana, a schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1); in Count 3 with felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924; and in Count 4 with using and carrying a firearm during and in relation to and in furtherance of the drug trafficking crime alleged in Count 2, in violation of 18 U.S.C. § 924(c). (J.A. 41-43). Defendant James was also charged in Count 6 with possession of a firearm, described as a .40 caliber, Glock pistol, in furtherance of the drug trafficking crime alleged in Count 5, in violation of 18 U.S.C. § 924(c). (J.A. 43).

3

<u>Defendant Bradley Maurice James</u>

On September 24, 2009, a jury found James guilty of Counts 5 and 6 of the indictment. (J.A. 437, ¶ 8). On March 2, 2010, the district court sentenced James to a term of imprisonment of 63 months on Count 5 and a consecutive term of 60 months' imprisonment on Count 6 of the indictment. (J.A. 58R, 452). On appeal of his conviction and sentence[1], James argued, among other things, that his sentence on Count 5 was procedurally unreasonable because the district court failed to address his request for a below-guidelines sentence. (J.A. 400). The Fourth Circuit held that the district court erred by failing to explain its chosen sentence and that the error was not harmless. (J.A. 401). The Fourth Circuit remanded the case for resentencing. (J.A. 401). At the resentencing hearing held on November 10, 2011, the district court sentenced James to a term of imprisonment of 63 months on Count 5 and a consecutive term of imprisonment of 60 months on Count 6, for a total term of imprisonment of 123 months. (J.A. 404, 412-13, 417). James filed a timely notice of appeal. (J.A. 423).

<u>Defendant Michael Defonte Bernard</u>

At a competency hearing held on October 6, 2009, the district court committed Bernard for mental health treatment under the provisions of 18 U.S.C. § 4242(d), noting that an evaluation

---

[1] <u>United States v. Bradley Maurice James</u>, 439 F. App'x 219 (4th Cir.), <u>cert. denied</u>, 132 S. Ct. 790 (2011) (unpublished).

4

performed at the Federal Correctional Institution, Butner, North Carolina (Butner) concluded that Bernard was unable to understand the nature and consequences of the proceedings against him, and was therefore not competent to stand trial. (J.A. 46-48). On June 4, 2010, with Bernard's and his counsel's concurrence, the district court found that Bernard's competency to stand trial had been restored, based upon a report from Butner. (J.A. 61, 62, 82). After a colloquy with Bernard, the district court also found that he was competent to waive his right to counsel, that he knowingly waived his right to counsel, and that he would be permitted to represent himself at trial. (J.A. 64-82). The district court appointed his then-defense counsel as standby counsel. (J.A. 82).

On July 13, 2010, a jury found Bernard guilty of the charges contained in the indictment. (J.A. 265, 349-50). At the sentencing hearing held on October 6, 2010, the district court removed Bernard from the court room and continued the hearing until such time as Bernard could be evaluated and administered mental health treatment to bring him "under control." (J.A. 361, 364-65). On January 5, 2011, at the re-convened sentencing hearing, the district court sentenced Bernard to concurrent terms of imprisonment of 120 months on Counts 1, 2, 3, and 5, and a consecutive term of imprisonment of 60 months on Count 4. (J.A. 368, 381-82, 388). Bernard filed a timely notice of appeal. (J.A. 394).

<u>STATEMENT OF FACTS</u>[2]

<u>Michael DeFonte Bernard's Competency Hearings</u>

On June 17, 2009, defendant Michael Defonte Bernard was admitted to Butner pursuant to a June 5, 2009, order of the district court for a mental health evaluation to determine Bernard's competency to stand trial. (J.A. 425). The evaluation was ordered under the provision of 18 U.S.C. § 4241. (J.A. 425). In a letter and report to the district court dated August 7 and August 5, 2009, respectively, the district court was informed that it was the opinion of the evaluator that Bernard suffered from a mental disease or defect, that is, schizophrenia that manifested itself in paranoid delusions, disorganized thought processes, and inappropriate and disruptive behaviors, and rendered him incompetent to proceed. (J.A. 425-34). The evaluator noted that Bernard had "been diagnosed with a severe mental illness," that he had "previously responded well to treatment," but that "the benefits of past treatment interventions appear[ed] to have been short-lived." (J.A. 434). The evaluator recommended that in order to restore Bernard's competency, he had to be committed for mental health treatment, to include the administration of anti-psychotic drugs in order to "ameliorate [his] paranoia, disorganized thinking, and impulsive behaviors." (J.A. 425, 434). The

---

[2]    The offense conduct applicable to both defendants was established from the transcript of defendant Michael Defonte Bernard's trial.

6

evaluation was to be conducted pursuant pursuant to 18
U.S.C. § 4241(d). (J.A. 425). On October 6, 2009, the district
court held a competency hearing during which Bernard stated that he
"decided to go pro se" at his upcoming trial, that he understood
the nature of the proceedings and his ability to assist his
counsel, and that he was "perfectly competent of standing trial"
without the need for commitment. (J.A. 46-50). The district court
permitted defense counsel, Walter Paramore, to continue in that
capacity, and committed Bernard to Butner. (J.A. 48-49).

On April 2, 2010, the district court was informed that
Bernard's psychiatric evaluation had been completed and that in the
examiner's opinion, Bernard's competency to stand trial had been
restored. (J.A. 456-58, 468). The evaluator's report enclosed a
Certificate of Restoration of Competency to Stand Trial which
stated that Bernard was "able to understand the nature and
consequences of the proceedings against him and to assist properly
in his own defense." (J.A. 458). The evaluator noted that
Bernard's prognosis was "mixed" because, although his symptoms
responded well to medication, Bernard had "poor insight into his
mental illness and need for treatment" and had "a history of
noncompliance with prescribed treatment." (J.A. 468).
Nevertheless, the evaluator noted the following:

> With respect to the issue of competency,
> Mr. Bernard currently has an adequate
> understanding of the charges against him and
> the possible penalties if convicted. He is

7

> aware of the roles of courtroom personnel, such as the jury, judge, prosecuting, and defense attorneys. He is capable of displaying appropriate courtroom behavior and attending to information during the court proceedings. He has a rational and factual understanding of the charges against him. He has an accurate knowledge of the system, both generally and as it pertains to his own case. He understands the nature and consequence of the proceedings against him and can assist his attorney in his own defense if he chooses to do so. Therefore, he is viewed as competent to stand trial.

(J.A. 468). The evaluator cautioned that Bernard's "competency to participate in legal proceedings is contingent upon his medication compliance." (J.A. 468).

On June 4, 2010, the district court held a competency hearing at which defense counsel stated that he had received the report of the psychiatric evaluator, that he had spoken with the "mental health professional at Butner," that he did not object to the admission of the evaluator's report without a witness, and that he and Bernard did not oppose the evaluator's finding of competency to stand trial. (J.A. 61-62). Defense counsel said that he had spoken with Bernard about his decision to "try his case and have [defense counsel] as standby counsel." (J.A. 63). Defense counsel stated that the defendant had "a lot on the line" because there were five charges against him and he is a career offender. (J.A. 63). Defense counsel stated as follows:

>There's a case called <u>United States v. Morano</u>[3] . . . which says that . . . the court uses the same standard in determining whether a defendant is competent to waive assigned counsel.
>
>And since that standard has been met, I believe that you could find that he is competent to waive counsel. And he does have a motion that he wants to bring to the court's attention, that he wants to appear pro se and have me assigned as standby counsel.

(J.A. 63). Defense counsel stated that he "warned" Bernard about representing himself, but that Bernard desired to represent himself anyway. (J.A. 63).

The district court inquired of Bernard whether he wanted defense counsel to act as standby counsel, and Bernard responded, "Yes, Sir." (J.A. 64). The district court asked Bernard if he understood that the medical staff at FCI Butner had found him competent to stand trial and to assist his attorney. (J.A. 64). Bernard stated that he understood. (J.A. 64). The district court asked Bernard if he wanted to represent himself, and Bernard responded, "Yes, Sir." (J.A. 64). The district court asked Bernard if he wanted Paramore to act as standby counsel, and Bernard responded, "Yes, Sir." (J.A. 64). The district court asked Bernard whether he intended to plead not guilty by reason of insanity and Bernard stated, "Yes, Sir," while acknowledging "a contradiction might be there as to . . . the pro se and the not

---

[3] Defense counsel was apparently referring to <u>Godinez v. Moran</u>, 509 U.S. 389 (1993).

9

guilty by reason of insanity." (J.A. 65). After discussion between the court and counsel concerning obtaining mental health records and an expert witness, defense counsel told the district court that he had obtained and provided Bernard with the trial transcript of codefendant Bradley James, and that Bernard "knows what the weight of the evidence and the strength of the government's case is against him." (J.A. 65-69).

Bernard provided the district court with background on his medical history, naming his social security disability due to mental and physical illnesses, suicide attempts, bi-polar disorder, and paranoid schizophrenia with a nervous condition. (J.A. 71). Bernard told the district court that his condition improved when he began taking his anti-depressants. (J.A. 72). Bernard told the district court that it was "not necessary that [he] go with a not guilty by reason of insanity," that he "could go with no contest . . . however you want to do it." (J.A. 72). After conferring with Bernard, defense counsel told the district court that Bernard did not want to "put on" an insanity defense and that he "wants to just try the case pro se and testify and argue to the jury that he's not guilty." (J.A. 73). Bernard then told the district court: "Yes, Sir. Your Honor, with the evidence and the motion for discovery I've read and the trial transcript, I can have a field day with these boys in court." (J.A. 73). Bernard told the district court that he did not want to be evaluated (as could

10

be requested by the government if he entered an insanity defense), and repeated that he would have a "field day with these guys in court" if he represented himself.  (J.A. 77).

The district court advised Bernard of each of the charges against him and their maximum penalties.  (J.A. 78-80).  Bernard stated he understood each charge and penalty.  (J.A. 78-80).  The district court asked Bernard if he had ever studied law, and Bernard responded, "No, Sir, I haven't."  (J.A. 78).  The district court asked Bernard if he ever represented himself or any other defendant in a criminal case, and Bernard responded, "No, Sir, I can't recall that I have."  (J.A. 78).  The district court asked Bernard if he realized the charges against him were serious ones, and Bernard stated that he did.  (J.A. 78).  The district court asked Bernard if he realized that if he represented himself, he was on his own, that the court could not tell him or advise him how he should try his case, and Bernard responded: "Yes, Sir."  (J.A. 80). The district court asked Bernard if he was familiar with the federal rules of evidence and Bernard answered: "For the most part."  (J.A. 80).  The district court asked whether he realized that the federal rules of evidence govern the admission of evidence and that Bernard would be subject to those rules.  (J.A. 80). Bernard responded: "I understand that, Sir."  (J.A. 80).  In response to the district court's questions, Bernard acknowledged that the federal rules of criminal procedure govern the manner in

11

which cases are tried and that he would be subject to those rules. (J.A. 80-81).

The district court advised Bernard that he "would be far better defended by a trained lawyer than [he could] be by [himself];" that it would be unwise for him to represent himself; that he was not familiar with law, procedures, or rules of evidence; and that it urged him not to represent himself. (J.A. 81). Bernard stated that the evidence was "all circumstantial," that "it's probable cause," and that "they had no search warrant." (J.A. 81). Bernard stated that he had reviewed the transcript and motion for discovery [in the James trial] and that he would "have a field day with this in court." (J.A. 81). The district court asked Bernard if it was still his desire to represent himself "in light of all the difficulties of representing [himself] and in light of the penalties that [he] might suffer." (J.A. 81). Bernard replied, "Yes, Sir. That's correct." (J.A. 81). Bernard further stated that he wanted to subpoena witnesses and he wanted the witnesses to be polygraphed. (J.A. 81). The district court found that Bernard knowingly waived his right to counsel, permitted Bernard to represent himself, and appointed defense counsel as standby counsel. (J.A. 82). Defense counsel stated that he had read the psychiatric report, had spent "four or five hours" with Bernard since he was returned from the evaluation, and had "no question about his competence to stand trial". (J.A. 82). The

12

district court found Bernard competent to stand trial. (J.A. 82).

During a bench conference, the district court stated that it was "not real comfortable with this," that if Bernard entered an insanity plea, and the government requested a mental evaluation, the court would requests that he be examined at a facility for a determination of criminal responsibility on the date of the crime as well as for competency to stand trial. (J.A. 82-83). The district court stated that it would order these evaluations "out of an abundance of caution." (J.A. 83). Standby counsel stated that Bernard was 49 years old, thought he had "nothing to lose by a trial," knew that if he were convicted he would "die in federal prison," and, "since he came back," was "more knowledgeable and a little bit less hyper and better at explaining himself." (J.A. 83). Standby counsel stated that he was "worried about [Bernard], whether he's really competent to waive the attorney issue." (J.A. 83). The district court observed that "competency or the question of insanity has a . . . qualitative aspect and a quantitative aspect," but that "as of this moment" the court was satisfied that Bernard was competent. (J.A. 85). Standby counsel told the district court that he would meet with Bernard weekly and would immediately inform the court's law clerks if he detected a problem with Bernard's competency. (J.A. 83).

13

Defendant's Opening Statement

At trial on July 12, 2010, Bernard made an opening statement in which he informed the jury that his "evidence would show that [he] had no criminal intent on any conspiracy charge and [he] did not do anything to anyone." (J.A. 124). Bernard told the jury that all of the government's evidence was "circumstantial and probable cause," and that the "DA" "had no search warrant." (J.A. 124). Bernard told the jury that one week prior to the events on trial, he was asked by a police officer to assist him to locate a man who "had been out four-wheeling" and had gotten away from the officer. (J.A. 124). Bernard stated that his intentions were to assist the officer as requested, but that the following week, Jamel James, whose father Bernard worked for, came to the Jermonts Lane residence with A.J. McCoy and "got [him] out of bed." (J.A. 124-25). Bernard told the jury that he had been on medication, had been disabled for over 25 years, that he was bi-polar, and had been "diagnosed as being paranoid schizophrenic, behavior disorder, emotional problem, nervous condition," and that the entrance of James and McCoy into the house made him nervous and afraid. (J.A. 125). Bernard explained that he "managed" to get some evidence "off the floor and put it in a bag," and that "the gun that [he] had was found in [the elder] James' yard a few nights before." (J.A. 125). Bernard told the jury that he had "found out who the guy was on the four-wheeler" and that the gun belonged to this man.

14

(J.A. 125).  Bernard said that he had intended to "turn everything

over to the law or whatever."  (J.A. 125).

Bernard told the jury that he left the house, notifying McKoy

and James that he "was going outside to watch for them."  (J.A.

125).  Bernard stated that when he went outside, he first "put the

stuff -- hid it down," but then noticed Officers "Caulk and Lanier

driving by, and they went down to the end of the road."  (J.A.

125).  Bernard told the jury that a drug dealer in a white car

drove up and that ultimately Officers Caulk and Lanier drove behind

the drug dealer's vehicle.  (J.A. 125).  Bernard also told the jury

that:

> I figured if I decoyed them . . . to get their
> attention I'd stop him and pretend that I was
> doing a drug -- a drug deal all the while I
> had the evidence there on me.  And that's when
> Mr. Lanier had pulled -- he threw the blue
> light on me and told me to get out and get
> your hands up.  So, I went in my pocket to
> give them the gun.  You know, I didn't try to-
> -you know, it wasn't that I was trying to
> resist arrest or anything.  So, he said, well,
> that's a good way to get shot.

(J.A. 125-26).  Bernard told the jury that one of the officers

seized marijuana from him "which [he] had got at the house" and the

firearm that belonged to the man on the four-wheeler.  (J.A. 126).

Bernard also told the jury that he had "some of the evidence from

the white car with the cocaine."  (J.A. 126).  Bernard told the

jury that while Sergeant Lanier was "dealing with the other guy

with the white car," he was trying to "throw [Deputy Caulk] hints"

15

that the men were in the house, but that Deputy Caulk ignored him. (J.A. 126).

The district court told Bernard that "[t]his is an outline of the evidence," and reminded the jury that "[Bernard's] words are not evidence because he is not under oath." (J.A. 126-27). Bernard told the jury that Sergeant Lanier picked up a "piece of a rock" [of cocaine] from the ground and was told by the driver of the white vehicle that the rock had come from Bernard's pocket. (J.A. 127). According to Bernard, Sergeant Lanier acknowledged to the driver that he saw cocaine on his license, but that he let the driver go. (J.A. 127). Bernard told the jury that he told the officers to call for back-up because A.J., Jamal, and Shawn were going to get away. (J.A. 127). Bernard told the jury that Sergeant Lanier "stood there and he let [A.J.]. . . drive right on by" with one of the coolers in the back of the car. (J.A. 127). Bernard told the jury that Shawn rode away on a bicycle while Sergeants Caulk and Lanier "was just standing out there or whatever like they were contemplating about something." (J.A. 127-28). Bernard told the jury that when one of the officers asked him if he knew the men, he replied "[t]hose are the guys I was trying to tell you that had the drugs in the trailer." (J.A. 128). Bernard told the jury that when asked for permission to search the trailer, he told the officers, [t]hat's what I've been trying to tell you, go into the trailer and get them." (J.A. 128). Bernard told the jury

16

that after the officers observed the large quantity of "weed" in the trailer, and after Shawn got away on the bike, Bernard was arrested and charged with "the dope." (J.A. 128).

<u>Offense Conduct and Trial Testimony</u>

At trial, the government produced the following evidence:

On November 5, 2007, officers of the Brunswick County Sheriff's Office were patrolling in an unmarked vehicle on Wolfridge Road in Spring Hill, North Carolina, as a result of citizens' complaints of drug activities in the area. (J.A. 147, 172-73). Officers observed Michael Bernard, whom they knew to be involved with drugs, leaning into a white Pontiac Grand Prix that was stopped in the roadway. (J.A. 148-49, 173, 261). Suspecting that a drug transaction was occurring, officers pulled up their vehicle behind the stopped vehicle and activated their blue lights. (J.A. 149, 152, 173-74). Once Bernard saw the officers, he put his hands in his pocket and began to walk away from the car. (J.A. 150). Officers ordered Bernard to stop and to take his hands out of his pocket, at which time they noticed a large bulge in his pants pocket. (J.A. 151-52). Officers asked Bernard what was in his pocket and he replied, "A gun," and he admitted to having marijuana. (J.A. 152, 155-56, 175). After frisking Bernard, officers recovered a .32 caliber firearm, a quantity of marijuana, and a portion of hard cocaine from his pockets. (J.A. 155-56). Bernard then told the officers, "If you scratch my back, I'll

17

scratch yours" meaning, "[t]hat if you help me, I'll help you." (J.A. 161). Bernard said he wanted to cooperate and that he could get the officers "the big boys that are moving kilos," referring to three black men who were cutting up kilos of marijuana in the trailer where he was staying. (J.A. 161-62, 176-77). Bernard was living in the trailer on Jermonts Lane to take care of four or five pit bulls Benji James, the owner of the trailer and the dogs, was incarcerated. (J.A. 162, 163, 165).

The driver of the Grand Prix was removed from the vehicle by one of the officers while another officer placed Bernard in handcuffs. (J.A. 174). After a consent search of the driver and the vehicle yielded no contraband, the driver was issued a verbal warning and was released. (J.A. 175-16). While officers were with Bernard, they saw a silver Honda pull out from the trailer and "a couple of males" come out of the trailer. (J.A. 164, 177). The males were known to law enforcement as codefendant Jamal Bradley James and Zedrick James. (J.A. 177-78). Bernard identified the male in the Honda as "A.J" and said he was helping them with the marijuana. (J.A. 177). When Bradley James and Zedrick James saw the officers, "they vacated the area." (J.A. 165). Bernard gave consent for the officers to search the trailer, and officers saw the pit bulls outside of the trailer and a black Pontiac Grand Prix GT two-door parked behind the trailer. (J.A. 164-65, 179, 182). Officers also saw two white coolers on top of a trash can at the

back door to the trailer with the odor of marijuana emanating from them. (J.A. 179-80). Inside the coolers were plastic wrapped and vacuum sealed bags, each containing marijuana residue. (J.A. 180). The packaging of the bags was indicative of trafficking in large amounts of marijuana and that the material was used to seal the cooler in order to mask the odor of the marijuana. (J.A. 181). Inside the trailer, the officers observed several bales of packaged marijuana, duffel bags, large digital scales, and cellophane of the type that is used to wrap pellets to prevent them from shifting. (J.A. 166). The officers secured the residence and obtained a warrant to search the premises. (J.A. 167, 182-83). The subsequent search of the trailer produced several large laundry bags containing blocks of marijuana, large blocks of marijuana inside a Pampers box that was on a set of Pelouze digital scales on the kitchen counter, and marijuana residue "all over the floor, [and] packaging material everywhere." (J.A. 186, 198-200, 203). Additional items were seized from the trailer included a firearm; various caliber ammunition, including .223 caliber ammunition of the type used by law enforcement in assault rifles; a firearms carrying case containing the upper portion of an AR-15 assault rifle found in the master bedroom closet; marijuana paraphernalia; a pill bottle bearing the defendant's name; a pill bottle bearing the name Bradley James; a Seal-a-Meal vacuum sealer containing marijuana residue; industrial style cellophane wrap; and in a money

bag between the mattress and box spring in the master bedroom, a crack pipe and crack pipe filters, an empty pill canister, receipts in the defendant's name, a state-issued citation in Bernard's name, and a real property receipt in the name of Winnie Bernard and heirs. (J.A. 186-98). A search of the Pontiac Grand Prix behind the trailer yielded "a significant amount" of United States currency; a .40 caliber Glock handgun containing .40 caliber Winchester hollow-point ammunition; an industrial-style roll of plastic wrapping material; a North Carolina driver's license and registration in the name of Bradley James; and a handgun holster. (J.A. 208-11, 218). All of this evidence formed the basis of the charges contained in the indictment against Bradley Maurice James and Bernard. (J.A. 41-45).

Bernard was transported to the Brunswick County Sheriff's Office, he was read his Miranda[4] warnings, stated he understood them, and agreed to cooperate. (J.A. 212-13). Bernard identified Zedrick and Bradley James as the men who were observed walking away from the Jermonts Lane residence, and admitted that he had been living at the residence "for quite some time." (J.A. 213). Bernard identified Bennie James as the home's owner and stated that he was taking care of James' dogs while he was incarcerated. (J.A. 213). Bernard further stated that Bradley James brought large packages of marijuana to the house on several occasions, including

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

that day, and that James cut up and re-packaged the marijuana "for sale and distribution from that residence." (J.A. 213). Bernard said that he was the only person living at the residence. (J.A. 214). Neither of the seized firearms were manufactured in North Carolina and both functioned as designed. (J.A. 219-21). The Glock was purchased by Bradley Jamal James. (J.A. 221, 222). Bernard interposed no objections during Sergeant Lanier's direct testimony and declined to cross-examine him. (J.A. 171-217).

Bernard made no objections during the government's case-in-chief and declined to cross-examine any of the government's (J.A. witnesses. (J.A. 170, 217, 225).

<u>Bernard's Testimony</u>

Out of the presence of the jury, the district court advised Bernard that he need not take the stand if he did not want to. (J.A. 226). In response to a motion by government counsel, the district court stated that it would not allow Bernard to express an opinion about his medical condition or competency. (J.A. 227).

After being sworn, and by way of background information, Bernard told the jury that he had a nervous breakdown when he was 21 years old and that he suffered from bi-polar disorder, a chemical imbalance, a nervous condition, and that he was diagnosed as paranoid schizophrenic. (J.A. 228). Bernard told the jury that he had been receiving social security disability benefits for over 25 years, that he was from a broken home, and that his mother died

21

of colon cancer in 1995. (J.A. 228). Bernard testified that he had a Bachelor of Arts degree in retail sales, had been a retail sales associate with "a major shoe company," until his mother's death, and that he was eligible for rehire with the shoe company. (J.A. 228).

Regarding the charges, Bernard testified that he was a caretaker for Bennie James. (J.A. 228). Bernard testified that at the time of the alleged offenses, James' son was incarcerated and James asked him to take care of his sons' pit bulls and to "keep the place clean and cut for him.". (J.A. 228). Bernard testified that Jamel, A.J. McCoy, and Shawn came into the house with guns and marijuana, woke him up, and that it made him "very nervous," so that he "just kind of laid back and cooperated, did what they asked [him] to do." (J.A. 229). Bernard testified that the men asked him to "go on the outskirts and lookout and see if any police was coming or whatever." (J.A. 230).

Bernard testified that when he left the house as requested, he "took the evidence and . . . put it beside the road," but that when he saw the police coming, he "picked it up and put it back on [him.] (J.A. 230). Bernard testified that the officers did not see him "bent over in the [white] car" until they drove up. (J.A. 230). Bernard testified that he was attempting to get evidence "because the guy [in the white car] . . . had a ball [of crack cocaine] on him like that." (J.A. 230). Bernard testified that

22

when Deputy Caulk told him to take his hands out of his pocket, he was "trying to be helpful" and reached into his pocket "and handed [Deputy Caulk] the gun." (J.A. 230). Bernard testified that he admitted to having marijuana in his possession and remained cooperative with the officers. (J.A. 230-31). Bernard testified that he tried to hint to the officer that the man in the white car had "an eight-ball on him." (J.A. 231). Bernard testified that he told the police, "you scratch my back, I'll scratch yours," and told him that the men were in the trailer, "where the weed came from, and the guy I got the coke from, he was the one that was in the car." (J.A. 231). Bernard testified that he noticed that when Sergeant Lanier asked the man in the car where he got the cocaine, the man said it must have fallen out of Bernard's pocket. (J.A. 231). Bernard testified that even though one of the deputies saw [cocaine] powder on the man's license, he let the man go. (J.A. 231).

Bernard testified that when he saw A.J. McCoy "coming through," he told Deputy Caulk to call for back-up because the men were getting away. (J.A. 231). Bernard testified that at about that time, one of the men drove away from the house with a cooler in the back of the vehicle, followed by Shawn who left the house and rode away on a bicycle. (J.A. 232). Bernard testified that Sergeant Lanier and Deputy Caulk were "standing there and they kept walking around like they were contemplating on something." (J.A.

23

232).  Bernard testified that he told the officers the identity of the men, that he told the officers where each of the men lived, that he told the officers that they were the men who had been in the trailer, and that the man who drove away from the trailer was one of them.  (J.A. 232).  Bernard testified that he gave the officers permission to search the trailer and that when they all entered the vehicle to drive to the trailer, Shawn and Jamal who "were standing out there . . . took off running."  (J.A. 232). Bernard testified that Sergeant Lanier ran after the man on the bike, but that he got away.  (J.A. 232-33).  Bernard testified that at the police station, he cooperated with the police and gave them a statement. (J.A. 233).  Bernard testified that his intention was to "help the law" and that he "knew nothing about the conspiracy or drugs."  (J.A. 233).  Bernard testified that he had "several run-ins with the law with police brutality" in the past, including at a community hospital.  (J.A. 234).  Bernard testified that he did not understand why the officers "let those guys go like that" and charged him when he "tried to help them."  (J.A. 234).

On cross-examination, Bernard testified that after he began working for Bennie James, he met Jamal James, Zedrick James, Shawn, and "all those guys."  (J.A. 235-36).  Bernard testified that he had seen the name of the criminal organization "Live Wire . . . written on the inside on some of the stuff in [the trailer]," but that he "never got with those guys."  (J.A. 236).

24

Bernard also testified that he was asked to work for "them," but that he never became involved with drugs or a conspiracy involving drugs. (J.A. 236). Bernard also testified that the crack pipe might have been his, but it was also possible that someone else placed the crack pipe in his bedroom. (J.A. 237). Bernard also testified that he did not know he could not possess firearms, that he had the firearm for three days, and that he put three ounces of marijuana that he had taken from the floor in a bag to show to the police as evidence of what the men were doing inside the trailer. (J.A. 238-39). Bernard identified the man whose vehicle he was observed leaning into as "Roger," that Sergeant Lanier let Roger go after seeing cocaine on Roger's license, and that he had found the pistol that was seized from his person underneath the car that he was intending to purchase from Bennie James' wife. (J.A. 240). Bernard testified that he "made it look like . . . a drug deal" when the police drove down the road and observed him leaning into Roger's car. (J.A. 241). Following the cross-examination, Bernard rested his case.

### Rule 29 Motions

After the government rested, Bernard moved for dismissal of the charges under Federal Rule of Criminal Procedure 29, stating that there was no substantial evidence that he was a member of the conspiracy. (J.A. 225). The district court denied the motion. (J.A. 226). Following the close of Bernard's case, he again moved

the district court for dismissal of the charges, but did not argue the motion. (J.A. 244-45). The district court denied the motion. (J.A. 245). The district court instructed the jury that closing arguments and instruction on the law would be held on the following day and recessed the proceedings. (J.A. 248, 250).

<u>Re-Opening of Defense Case</u>

On the following morning, July 13, 2010, out of the presence of the jury, Bernard asked the district court to be allowed to cross-examine Sergeant Lanier, stating that the district court did not give him an opportunity to do so on the previous day. (J.A. 251, 253, 267). Bernard's standby counsel stated that Bernard said, "No questions," when asked to cross-examine Sergeant Lanier. (J.A. 268). Also, Bernard told the district court that although he received a letter from standby counsel informing him that he could not subpoena witnesses, he nevertheless needed the witnesses to establish that he "had nothing to do with this." (J.A. 269). Standby counsel explained to the district court that he had been told by counsel for Jamal Bradley James that James would not testify for Bernard and would plead the Fifth Amendment if called. (J.A. 270). Standby counsel also told the district court that counsel for Shawn Zedrick James said his client would plead the Fifth Amendment if called as a witness for Bernard because he had pending state charges. (J.A. 270-71). Standby counsel told the district court that Bernard did not understand the Fifth Amendment.

26

(J.A. 271). The district court stated that Bernard elected to represent himself. (J.A. 271). Bernard acknowledged that standby counsel had informed him that Shawn Zedrick James and Jamal Bradley James would assert the Fifth Amendment if called to testify. (J.A. 272).

The district court reviewed the jury instructions with the parties and standby counsel. (J.A. 268-69, 273-77). Standby counsel informed the district court that he had prepared a "very fair jury argument" for Bernard and a motion to strike the portion of Agent Glasscock's testimony that identified Bernard's prior convictions, but that Bernard declined to use both documents. (J.A. 277-78; see J.A. 223, 273-74). The district court allowed Bernard to re-open his case in order to question Sergeant Lanier. (J.A. 253, 279-82). During the examination, Bernard asked Sergeant Lanier if he had dealt with mental patients during his law enforcement career, to which Sergeant Lanier replied, "Yes, I have." (J.A. 254). Bernard asked Sergeant Lanier if "a person with bipolar disorder or a chemical imbalance and diagnosed as being schizophrenic, when under pressure" would be "quite nervous?" (J.A. 254). Sergeant Lanier responded that he could not "speak to the character of somebody with a mental condition" because he was not a doctor. (J.A. 254). Bernard asked Sergeant Lanier why Deputy Caulk did not relay to him "that the guys were back in the trailer and to move when I asked you all to move?" because

27

Bernard's "life [was] on the line." (J.A. 254). The district court sustained the government's objection to the question. (J.A. 254). Bernard asked Sergeant Lanier why he did not get a search warrant at that time, rather than "wait until those boys got away." (J.A. 255). Sergeant Lanier responded that they did not need a search warrant at that time because Bernard gave them consent to search the trailer. (J.A. 255). Over the government's objections, Bernard told Sergeant Lanier that he was disabled, nervous, and had several "run-ins with the law," and that he was "very upset that these people have brought this on [him]," but were never charged or arrested. (J.A. 256). In response to a question from Bernard, Sergeant Lanier testified that he did not tell the man driving the white car that he saw "powder on his license." (J.A. 257). Bernard disputed with Sergeant Lanier, saying, "Yes, you did, Steve." (J.A. 257).

The district court cautioned Bernard not to argue with the witness. (J.A. 257). When Bernard continued to argue, the district court excused the jury and asked the defendant if he had any additional questions for Sergeant Lanier. (J.A. 258). Bernard asked Sergeant Lanier about the eight-ball of cocaine that the man in the white car said must have fallen out of Bernard's pocket. (J.A. 258). Sergeant Lanier responded that there were "no drugs found in the white car on the guy." (J.A. 258-59). Bernard responded, "I know. It was on the ground. You picked it up off

-- you found it on the ground, didn't you?" (J.A. 259). The
district court instructed Bernard to either "ask a straight out
question or else [the court is] going to have you removed from the
courtroom." (J.A. 259).

Bernard told the district court that he wanted to have a
polygraph administered to Sergeant Lanier, and that because of his
disability, he did not understand the stipulations that he entered
into on the previous day. (J.A. 259-60). The district court told
Bernard that the case would now be argued to the jury, and brought
the jury back into the courtroom. (J.A. 260). Bernard asked
Sergeant Lanier if he was aware of occasions when he requested
police assistance because of people who were selling drugs on his
property and shooting in his trailer. (J.A. 260-61). Sergeant
Lanier responded that he was only aware of having arrested Bernard
for drugs on several different occasions. (J.A. 261). In response
to a question from Bernard, Sergeant Lanier testified that Bernard
had prior convictions for drug violations. (J.A. 261). Bernard
disputed this statement, saying that although Sergeant Lanier had
arrested him several times, the charges were dropped. (J.A. 261).
The district court terminated Bernard's examination of Sergeant
Lanier. (J.A. 261).

On cross-examination by government counsel, Sergeant Lanier
testified that criminal charges were pending against Zedrick James
and Jamal Bradley James, who were charged based upon the facts of

29

this case and about whom Sergeant Lanier had previously testified in federal court. (J.A. 262). Sergeant Lanier also testified that he found no drugs in the white vehicle. (J.A. 262). On re-direct of Sergeant Lanier, Bernard asked Sergeant Lanier, "Did you or did you not say . . . that I see there's powder on your license, but I'm going to let you leave." (J.A. 263). Sergeant Lanier replied, "No, Sir, I didn't." (J.A. 263). Bernard challenged Sergeant Lanier that he did make the statement. (J.A. 263). Bernard asked Sergeant Lanier why he and Deputy Caulk did not pursue the men in the trailer. (J.A. 263-64). Sergeant Lanier responded, "Because myself and Sergeant Caulk were dealing with you, an armed person with marijuana in his pocket." (J.A. 264). When Bernard told Sergeant Lanier that there was nothing he could do because he was in handcuffs, and that he was trying to cooperate with the officers, the district court terminated the questioning. (J.A. 264).

<u>Bernard's Closing Argument</u>

During his closing argument, Bernard repeated that Mr. James asked him to "take care of his son's place while he was gone," and that "his brother came in there and all this came on me." (J.A. 300). Bernard argued that he was disabled, that he had to call the Brunswick County Sheriff because of people with drugs who trespassed on his property, that people have tried to kill him, and that he was beaten by sheriff's deputies after having several "run-

30

ins" with the law in the past. (J.A. 300-01). Bernard said he tried to commit suicide several times, but that "God just didn't see for [him] to leave." (J.A. 301). The district court urged Bernard to argue his case. (J.A. 301). Bernard discussed the condition of his father's health and the colon cancer to which his mother succumbed. (J.A. 302). Bernard stated that he tried to assist the officer in identifying the man on the four-wheeler and he argued that Sergeant Lanier had given an unsecured bond to someone (presumably the man in the white car) and "let him go." (J.A. 303). Bernard told the jury that "the law is so crooked," and stated that he had "never been involved with anything like this." (J.A. 303).

During the government's closing argument, Bernard objected and interrupted several times, saying "that's defamation of character," describing his mental condition, stating of government counsel, "[H]e's really beginning to get to me, Your Honor, because he, you know, he stinks;" "I]s that how you do disabled people who's trying to help the law;" and "[W]hy did they let the two guys that's home now--wasn't brought before you." (J.A. 304-06).

Following a brief deliberation, the jury found Bernard guilty of the charges contained in the indictment. (J.A. 349). The district court continued Mr. Paramore as standby counsel. (J.A. 354).

31

Bernard's Presentence Report

A presentence investigation was conducted by a United States Probation Officer and a presentence investigation report (PSR) was prepared. (J.A. 513-33). In the report, the probation officer found that the base offense level for a violation of 21 U.S.C. § 841(a)(1) is found in USSG §2D1.1(c)(7) and calls for a base offense level of 26 because Bernard was accountable for 800 pounds/362.88 kilograms of marijuana, 0.1 grams of cocaine base, and 250 milligrams of MDMA, which had a combined marijuana equivalency of 365.01 kilograms. (J.A. 528, ¶ 71). The probation officer found the total offense level to be 26. (J.A. 529, ¶ 79).

Bernard's criminal history consisted of multiple convictions for misdemeanor offenses and two felony convictions for possession of cocaine. (J.A. 519-523, ¶¶ 23-41). The subtotal of the criminal history points was 14, but inasmuch as only 4 points could be added pursuant to USSG §4A1.1, the revised subtotal was 12. (J.A. 523, ¶ 42). Two levels were added to the criminal history points, pursuant to USSG §4A1.1(d), because Bernard was on probation at the time of the instant offense. (J.A. 523, ¶ 43). Because the instant offense was committed less than two years after Bernard's release from custody on June 29, 2006, pursuant to USSG §4A1.1(e), one point was added to the criminal history points. (J.A. 523, ¶¶ 40, 44). The total of the criminal history points was 15, establishing a criminal history category of VI. (J.A. 523,

32

¶ 45).  The combination of criminal history category VI and total offense level 26 produced an advisory guidelines range of 120 to 150 months' imprisonment on Counts 1, 2, and 5 of the indictment. (J.A. 529, ¶ 82).  Based on criminal history category VI and total offense level 26, the guidelines range for imprisonment on Count 3 of the indictment was 120 months, the statutory maximum sentence. (J.A. 529, ¶¶ 83-84).  The probation officer found that the minimum statutory sentence for a violation of 18 U.S.C. § 924(c), as charged in Count 4 of the indictment, was 60 months' imprisonment. (J.A. 529, ¶¶ 85-86).  The probation officer indicated that a downward departure may be warranted, pursuant to USSG §2K2.13, if the defendant committed the instant offense while suffering from significantly reduced mental capacity that contributed substantially to the commission of the offense.  (J.A. 531, ¶ 105). Bernard, through defense counsel, objected to the relevant conduct included in the PSR, stating that he did not have the requisite intent to possess marijuana, that he did not possess cocaine with an unlawful purpose, that he did not possess the firearm while engaged in drug trafficking, and that in any event, he did not have the intent to commit the firearm offense.  (J.A. 533).

### Bernard's Sentencing Hearing

In a bench conference before Bernard's sentencing hearing on October 6, 2010, standby counsel told the district court that on the previous night, Bernard told him that he was not coming to

33

court.  (J.A. 356).  When Bernard was brought into the courtroom, he threw the bible down, cursed, stated that God was a demon, and stated he wanted a court order for Henry Brown, the medical director of Brunswick Community Hospital, who left him "debilitated." (J.A. 356-57).  Standby counsel told the district court, "Im not sure again of Mr. Bernard's competence." (J.A. 357).  After Bernard continued to exhibit unruly behavior and to speak irrationally, the district court instructed the Marshals to remove him to the holding cell, but to turn on the intercom so that Bernard could hear the courtroom proceedings.  (J.A. 358-66).  Standby counsel attempted to ask the district court to depart below the advisory guidelines range based upon Bernard's mental disabilities.  (J.A. 359-60).  When the district court was informed that there was no speaker in the holding cell, the district court had Bernard returned to the courtroom.  (J.A. 362-63).  Ultimately, the district court continued the sentencing hearing, recommending that Bernard be held at Butner where "they [can] try to evaluate him and . . . try to administer his medicine so when he comes back he'll be under control." (J.A. 365).

On January 5, 2011, the district court held the re-scheduled sentencing hearing.  (J.A. 368-85).  Defense counsel objected to the PSR, stating that there were no facts to support the offense conduct section of the report.  (J.A. 370).  Defense counsel stated that Bernard understood that he would lose the objection.  (J.A.

34

370).   Defense counsel stated that Bernard apologized for his conduct at the previous hearing, and asked the district court to send him back to Butner for mental health treatment.   (J.A. 371-72).   Defense counsel stated that he "did not file a downward variance motion . . . for departure because [he] felt like [he'd] be talking out of both sides of [his] mouth."   (J.A. 372).   Defense counsel argued that Bernard's role in the offense was minor, that he was a look-out, and that Bernard removed himself from the trailer when the men came in with weapons.   (J.A. 372-73).   Defense counsel discussed Bernard's mental condition, his drug use, his family that was present in court, and asked the district court to sentence him to 120 months' imprisonment-the low end of the guidelines range-for the drug offenses and a consecutive term of 60 months' imprisonment for the firearms offense.   (J.A. 373-75).   The district court overruled defense counsel's objection to the PSR. (J.A. 378).

Bernard told the district court that he had been taking his medication, listened to his attorney and the "D.A.," and was "well aware of what's going on in here."   (J.A. 378).   Bernard told the district court that five years ago, he was jumped in a community hospital where Henry Brown is the medical director.   (J.A. 378-79). Bernard discussed the facts of the instant case and stated that the investigation was a "cover-up and sabotage against [him]."   (J.A. 379).

35

The district court calculated the advisory guidelines range, conducted an individualized assessment of Bernard under the 18 U.S.C. § 3553(a) factors, and sentenced the defendant to concurrent terms of imprisonment of 120 months on Counts 1, 2, 3, and 5, and a consecutive term of 60 months on Count 4, for a total term of 180 months' imprisonment.  (J.A. 381-82, 388).

### Bradley Maurice James

### Presentence Investigation report

On September 24, 2009, a jury found defendant James guilty of Counts 5 and 6 of the indictment.  (J.A. 437).  A presentence investigation report was completed by a United States Probation Officer and a presentence investigation report (PSR) was prepared.  (J.A. 435-46).  In the PSR, the probation officer calculated James' total criminal history points to be 1, establishing a criminal history category I.  (J.A. 444, ¶ 50).  The probation officer calculated James' advisory guidelines range for imprisonment on Count 5 to be 63 to 78 months' and noted that the minimum statutory sentence on Count 6 was a consecutive term of 60 months' imprisonment.  (J.A. 444, ¶¶ 51-52).

### Appeal and remand

On March 2, 2010, the district court sentenced James to a term of imprisonment of 63 months on Count 5 and a consecutive term of

60 months' imprisonment on Count 6. (J.A. 58R, 452). On appeal[5], James argued, among other things, that his sentence on Count 5 was procedurally unreasonable because the district court failed to address his request for a below-guidelines sentence. (J.A. 400). The Fourth Circuit held that the district court erred by failing to explain its chosen sentence and that the error was not harmless. (J.A. 401). The Fourth Circuit remanded the case for resentencing. (J.A. 401). At the resentencing hearing held on November 10, 2011, defense counsel reminded the district court that in the prior sentencing hearing, he argued for a below-guidelines sentence based on the 18 U.S.C. § 924(c) count, which the Fourth Circuit ultimately upheld. (J.A. 407; see J.A. 398-99, 401). Defense counsel asked the district court to "consider a bottom of the guideline range sentence for Count Five" based on the fact that, prior to his federal prosecution, James had been on state bond "for almost two years with no violations." (J.A. 407). Defense counsel argued that James had been a federal prisoner for over two years, had no write-ups during that period, and had been working to better himself. (J.A. 407). Defense counsel acknowledged that a 60-month sentence on Count 6 was mandatory. (J.A. 407).

The district court stated that James' criminal history consisted of one misdemeanor for failure to heed a light or siren;

---

[5]    United States v. Bradley Maurice James, 439 F. App'x 219 (4th Cir.), cert. denied, 132 S. Ct. 790 (2011) (unpublished).

37

that in the instant offense, he possessed 800 pounds of marijuana and possessed a firearm in conjunction with drug trafficking; that he had no employment history; that there was no W-2 on file evidencing employment; that he possessed a 2008 Infinity G37 vehicle with a tax value of $30,500, and put $8,000 down on the vehicle in the absence of employment; and that wrappers for 200 pounds of "pot" were found in the cooler in James' vehicle. (J.A. 408-09). After hearing from government counsel, the district court stated that James' lack of employment and purchase of the vehicle indicated that he had been "involved in the drug business for quite some time." (J.A. 410). Defense counsel argued that James and his family "own significant portions of land" in Brunswick County which enabled James to satisfy his bond in state court. (J.A. 410). Defense counsel argued that James purchased the firearm lawfully, that it was registered to him, and that it was inside of his locked vehicle. (J.A. 410-11). Defense counsel argued that, even though the cooler had wrappers in it and there were "90 pounds or whatever" of marijuana inside the trailer, Bernard was living in the trailer. (J.A. 411). Defense counsel argued that he was not aware of evidence that connected James to the receiver to the AR-15 or ammunition. (J.A. 411). The district court stated that James' "lack of work history is within the contours of a drug dealer's lifestyle," and that there was information "from Mr. Bernard, Mr. Greene, and Mr. McCallister that [James] had trafficked in a

38

considerable amount of . . . marijuana." (J.A. 411). The district court calculated the advisory guidelines ranges. (J.A. 411-12). Defense counsel noted that at the previous sentencing hearing, the district court "disregarded the relevant conduct except for the 90.72 kilograms, which lowered [James'] base offense level. (J.A. 412). The district court stated, "Well, I understand that, but I . . . think the evidence shows he's a large dealer." (J.A. 412). The district court sentenced James to a term of 63 months' imprisonment on Count 5 and a consecutive term of 60 months' on Count 6, for a total term of imprisonment of 123 months. (J.A. 412-13, 417).

<u>SUMMARY OF ARGUMENT</u>

1.    The district court did not err when it found Bernard mentally competent to represent himself at trial.  <u>Indiana v. Edwards</u>, 554 U.S. 164 (2008), permits a trial court to find a mentally ill defendant competent to represent himself if that mental illness is not so severe as to disqualify him from self-representation.    The district court determined Bernard to be competent to represent himself based upon his restoration to competency, his behavior, his responses to the district court's questions, his demeanor, and the district court's observations of him before and during the trial.    Bernard's mental status did not decline until the original sentencing hearing when he was represented by counsel.    Thus, Bernard has failed to show plain error in the district court's finding that he was competent to conduct his trial.

2.    Defense counsel was not ineffective in failing to cite the correct legal standard for competency to represent oneself at trial.    To establish ineffectiveness of counsel, Bernard must show that a reasonable probability that the result of the proceedings would have been different but for counsel's error.    Here, there is every reason to believe that the district court would have found Bernard competent to represent himself even if defense counsel had cited the court to <u>Indiana v. Edwards</u> because the district court's finding of competency was based upon Bernard's behavior, demeanor,

responses' to the court's questions, and the psychiatric report certifying Bernard's restoration to competency. Accordingly, the defendant has failed to show that defense counsel was ineffective.

3. James' sentence was procedurally reasonable. The district court properly calculated the advisory guidelines range, and provided a detailed explanation of the sentence it imposed based upon James' large-scale drug trafficking, firearm possession, purchase of an expensive vehicle with no visible source of income, and lack of work history. Thus, the sentence was procedurally reasonable.

4. James' counsel was not ineffective when he did not request a downward variance or a below-guidelines sentence on Count 5 of the indictment. Defense counsel's representation during James' first appeal resulted in a remand for resentencing on Count 5. However, the Fourth Circuit's affirmance of James' conviction of that count eliminated defense counsel's argument for a below-guidelines sentence on that count. Defense counsel's cogent arguments to the district court for a bottom-of-the-guidelines sentence were the best that could be made under the circumstances. Accordingly, defense counsel was not ineffective for failing to seek a downward variance or a below-guidelines sentence.

<u>ARGUMENT</u>

I.   THE DISTRICT COURT DID NOT PLAINLY ERR WHEN IT FOUND BERNARD
     MENTALLY COMPETENT TO REPRESENT HIMSELF AT TRIAL

     A.   <u>Standard of Review</u>.

     Issues raised for the first time on appeal are reviewed for
plain error.  <u>United States v. Olano</u>, 507 U.S. 725, 732 (1993).

     B.   <u>Discussion of issue</u>.

     Bernard argues that the district court erred as a matter of
law when it applied the standard of <u>Godinez v. Moran</u>, 509 U.S. 389
(1993), rather than the standard of <u>Indiana v. Edwards</u>, 554 U.S.
164 (2008), to determine whether he was competent to waive counsel
and represent himself at trial.  (Brief at 39).  Because the
defendant presents this argument for the first time on appeal, he
must show that the district court committed plain error.  <u>United
States v. Olano</u>, 507 U.S. 725, 732 (1993).  To establish plain
error, the defendant must show that an error occurred, that the
error was plain, and that the error affected his substantial
rights.  <u>Id.</u>  To show that the error affected substantial rights,
he must demonstrate the error was prejudicial, in other words, that
it affected the outcome of the district court proceedings.  <u>Id.</u> at
734.  Even if the defendant makes this three-part showing,
correction of the error remains within this Court's discretion,
which it "should not exercise . . . unless the error 'seriously

42

affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Id. at 732 (quoting United States v. Young, 470 U.S. 1, 15 (1985)). The defendant cannot sustain this burden.

A defendant in a criminal action has a Sixth Amendment right to self-representation. Faretta v. California, 422 U.S. 806, 819, 821 (1975). A defendant may waive the right to counsel and proceed pro se only if the waiver is knowing, intelligent, and voluntary. Godinez v. Moran, 509 U.S. 389, 400 (1993). In Moran, 509 U.S. at 399, the Supreme Court held that the level of mental competency required of a defendant seeking to waive his right to counsel is the same as that required for him to waive his right to trial. However, more recently, in Indiana v. Edwards, 554 U.S. 164, 174 177-78 (2008), the Court held that the Constitution permits a State to limit a defendant's right to represent himself at trial when it determines that the defendant lacks the mental capacity to conduct his trial defense, unless he is represented by counsel. The Court stated that notwithstanding the Sixth Amendment, a State may insist that those defendants be represented by trial counsel who are "competent enough to stand trial under Dusky[6] but who still suffer from severe mental illness to the point where they are not

---

[6] Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam). In Dusky, the Supreme Court held stated the test for determining mental competence to stand trial as (1) "whether [the defendant] has a rational as well as factual understanding of the proceedings against him," and (2) whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding."

competent to conduct trial proceedings by themselves." <u>Edwards</u>, 554 U.S. at 178. Rather than "adopt . . . a more specific standard" to determine competency in these cases, <u>Edwards</u>, 554 U.S. at 178, the Supreme Court recognized that the trial judge "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individual circumstances of a particular defendant." <u>Id.</u> Thus, <u>Edwards</u> permits, but does not <u>compel</u> the trial court to insist that a mentally ill defendant be represented by counsel. Only those defendants whose mental illness is so severe as to render them incompetent to conduct their trial proceedings are disqualified from acting as their own lawyer. It is therefore entirely permissible for a trial court, having found a mentally ill defendant competent to stand trial under the facts of a given case, to determine him to be competent to represent himself at trial. In <u>United States v. DeShazer</u>, 554 F.3d 1281, 1290 (10th Cir. 2009), the Tenth Circuit Court of Appeals held:

> Thus, while the district court was not compelled to find Mr. DeShazer competent to waive his right to counsel simply because the court had found him competent to stand trial, it does not follow that the district court was absolutely prohibited from doing so. To the contrary, <u>Edwards</u> itself reaffirmed that a court may constitutionally permit a defendant to represent himself so long as he is competent to stand trial.

(citation omitted).

Contrary to Bernard's claims, the trial court was only required to measure his competency to represent himself under the

44

Edwards standard if it found him severely mentally ill at the time of trial.  The district court was keenly aware of Bernard's mental condition, having committed him for evaluation and subsequent treatment, held two competency hearings to determine his competency to stand trial, engaged him in colloquy to determine his competency to represent himself, and presided over his trial.  (J.A. 47-50, 62-83, 129-349).  By a June 5, 2009, order, the district court admitted Bernard for a determination of his competency to stand trial.  (J.A. 425).  At the competency hearing on October 6, 2009, Bernard stated that he "decided to go pro se," that he understood the nature of the proceedings and his ability to assist his counsel, and that he was "perfectly competent of standing trial" without the need for commitment.  (J.A. 46-50).  Nevertheless, the district court committed Bernard, based upon the report of the mental health evaluator which concluded that he was not competent to stand trial.  (J.A. 48-49; see J.A. 4).

In a competency hearing on June 4, 2010, the district court found Bernard competent to stand trial based both upon its personal assessment of Bernard and upon the evaluator's conclusion that certified his competency to be restored, even though his prognosis was mixed.  (J.A. 61, 62, 82, 458, 468).  In determining Bernard's competency to waive his right to counsel, the district court inquired of him whether he wanted defense counsel to act as standby counsel, if he understood that the medical staff had found him

45

competent to stand trial and to assist his attorney, if he wanted
to represent himself, and if he wanted defense counsel to act as
standby counsel.  (J.A. 64).  Bernard answered affirmatively to
these questions and the district court was able to observe his
demeanor and make judgments about his mental abilities. (J.A. 64).
Further, Bernard appropriately recognized that representing himself
may appear to a jury to be inconsistent with an insanity defense.
(J.A. 65).  The fact that Bernard chose to abandon an insanity
defense rather than obtain an expert witness and provide written
notice of the defense to the government was neither "erratic" (see
Brief at 41) nor necessarily symptomatic of mental illness.  As his
counsel stated, Bernard "[knew] what the weight of the evidence and
the strength of the government's case [was] against him" and
"want[ed] to just try the case pro se and testify and argue to the
jury that he's not guilty."  (J.A. 69, 73).  The right to self-
representation included Bernard's right to "present his case in his
own way."  McKaskle v. Wiggins, 465 U.S. 168, 177 (1984).

Bernard claims that his severe mental illness was demonstrated
when he showed ambivalence about whether to employ an insanity
defense and that he was in the throes of grandiose delusions when
he told the district court that he could "have a field day with
these boys [prosecutors] in court."  (Brief at 41).  However,
defendants who choose to represent themselves do so because they
believe they are more capable than trained attorneys to conduct

46

their own defense.  "A court is not required to ensure that the defendant is capable of representing himself as well as a trained and experienced lawyer, only that he understands the risks involved in representing himself and that he has knowingly and intelligently chosen self-representation." United States v. Ladoucer, 573 F.3d 628, 633 (8th Cir. 2009) (citing, United States v. Patterson, 140 F.3d 767, 774 (8th Cir. 1998).  Here, the district court informed Bernard of the risks involved in self-representation and urged him not to represent himself. (J.A. 78-81).  The district court found that Bernard had knowingly waived his right to counsel. (J.A. 82).  As the Edwards test acknowledges, the district court was "best able to make more fine-tuned mental capacity decisions, tailored to [Bernard's] circumstances." Indiana v. Edwards, 554 U.S. at 177.  Bernard's "ability to represent himself ha[d] no bearing upon his competence to choose self-representation." Godinez v. Moran, 509 U.S. 389, 400 (1993).

Bernard argues that defense counsel's "deep[()] concern" about his ability to waive counsel and the district court's "strong reservations" counseled against permitting him to represent himself.  (Brief at 42).  However, defense counsel told the district court that he would immediately notify the court if he detected a change in Bernard's competency, thus demonstrating that, though concerned, he did not judge Bernard to be incompetent to represent himself.  (See J.A. 83).  Furthermore, the reason the

47

district court was "not real comfortable" with Bernard's self-representation was because it correctly observed that "competency or the question of insanity has a qualitative aspect and a quantitative aspect." (J.A. 85). That is also why—in recognition of Bernard's bipolarism—the district court appropriately had Bernard "in leg shackels which [were] hidden from the jury." (J.A. 136). The district court was satisfied "as of this moment" that Bernard was competent to represent himself. (J.A. 85). The district court's satisfaction was justified throughout the trial because Bernard was able to make opening and closing statements, testify, and have his case re-opened to conduct an examination of a law enforcement officer. (See J.A. 124-28; 227-44; 253-64; 299-303). It was only at the first sentencing hearing that Bernard's mental functioning was clearly compromised. At that point, the district court committed Bernard for evaluation and treatment and rescheduled the hearing, having re-appointed defense counsel to represent him prior to the hearing.[7] (J.A. 356-65).

Bernard claims that the district court was required to sua sponte reconsider its decision that Bernard was competent to stand trial or to represent himself. (Brief at 47). This claim is without merit.

---

[7] Apparently, the district court had already determined that defense counsel would represent Bernard at the sentencing hearing rather than serve as standby counsel. (See J.A. 358-60) (arguments of defense counsel at sentencing hearing).

Title 18, United States Code, Section 4241(a) provides that the district court shall conduct a competency hearing and/or order the defendant to undergo a psychiatric evaluation "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent . . . ." Whether "reasonable cause" exists is a question left to the sound discretion of the district court. United States v. Mason, 52 F.3d 1286, 1289 (4th Cir. 1995); Newfield v. United States, 565 F.2d 203, 206 (2d Cir. 1977). Reasonable cause may be established through "evidence of irrational behavior, the defendant's demeanor at trial, and medical opinions concerning the defendant's competence." Mason, 52 F.3d at 1290. "[T]he presence of some degree of mental illness is not to be equated with incompetence . . . ." Hall v. United States, 410 F.2d 653, 658 (4th Cir. 1969); see also United States v. Garrett, 903 F.2d 1105, 1117 (7th Cir. 1990). Rather, the legal test for competency is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether [he] has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960). The statute is triggered only if the defendant is "presently" incompetent at the time the defendant stands trial. See United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986) ("The question of competency to stand trial is limited

49

to the defendant's abilities at the time of trial"); Garrett, 903 F.3d at 1117 ("[P]rior psychiatric commitments are not necessarily dispositive of whether the defendant may presently be [incompetent]) (internal quotation marks omitted).

In this case, Bernard's behavior during his trial called neither the district court's determination of competency to stand trial nor competency to represent himself into question. Bernard' failure to object during the government's case-in-chief, question two of the witnesses, call witnesses on his own behalf, or otherwise "think like a lawyer" did not render him mentally incompetent. See United States v. Ahrendt, 560 F.3d 69, 74 (1st Cir. 2009) (holding that sua sponte competency hearing not required when defendant who "lived in a different world" made successful objections and cross-examined government witnesses in an attempt to show that hearsay requirements were not met). Indeed, Bernard's mental state did not show marked decline until October 6, 2010, three months after the trial. (J.A. 355). The fact that reasonable cause may exist to believe a defendant is incompetent to stand trial at one point in time is not dispositive of whether reasonable cause exist at another point in time. Garrett, 903 F.3d at 1117. Indeed, "[w]hile a [defendant] did act in ways that appear bizarre or irrational, such behavior does not invariably compel a finding of incompetency." United States v. Turner, 644 F.3d 713, 725-26 (8th Cir. 2011). The district court was in the

best position to observe Bernard and its determinations based on observing him at trial are entitled to deference. <u>United States v. Vamos</u>, 797 F.2d 1146, 1150 (2d Cir. 1986). <u>See also</u>, <u>United States v. Banks</u>, 482 F.3d 733, 743 (4th Cir. 2007) ("district court . . . is in a superior position to adjudge the presence or indicia of incompetency constituting reasonable cause to initiate a hearing."). Thus the district court did not plainly err by not revisiting *sua sponte* the issue of the defendant's mental capacity during the trial. Accordingly, the district court did not err, much less plainly erred, in its application of the legal standard used to determine his competency to represent himself at trial.

II. DEFENSE COUNSEL WAS NOT INEFFECTIVE IN FAILING TO CITE THE CORRECT LEGAL STANDARD TO DETERMINE BERNARD'S COMPETENCY TO REPRESENT HIMSELF.

    A.   <u>Standard of Review</u>.

An ineffective assistance of counsel claim is not cognizable on a defendant's direct appeal of a criminal judgment unless the record conclusively establishes that defense counsel failed to provide effective assistance. <u>United States v. Baptiste</u>, 596 F.3d 214, 216 n.1 (4th Cir. 2010); <u>United States v. Baldovinos</u>, 434 F.3d 233, 239 (4th Cir. 2006).

    B.   <u>Discussion of Issue</u>.

Claims of ineffective assistance of counsel are not cognizable on direct appeal unless the record conclusively shows that defense counsel did not provide the defendant with effective assistance.

51

United States v. Martinez, 136 F.3d 972, 979-80 (4th Cir. 1998); see also United States v. Baptiste, 596 F.3d 214, 216 n.1 (4th Cir. 2010); United States v. Baldovinos, 434 F.3d 233, 239 (4th Cir. 2006). The purpose of this rule is to prevent the presentation for review of claims as to which the parties have not had an opportunity to develop an evidentiary record. Bernard did not present his claim of ineffective assistance of counsel to the district court, and he, therefore, cannot present his claim on direct appeal absent conclusive evidence in the record to support it.

The record confirms that defense counsel did not cite the Edwards test for determining whether Bernard was suffering from a mental illness that was severe enough to disqualify him from self-representation. (J.A. 63). However, as has been shown above, nothing in the defendant's trial demeanor and behavior called into question the district court's—and the mental evaluator's—determination that he was competent to stand trial or the court's finding that he was competent to represent himself. The change in Bernard's mental condition was not manifested until three months after his trial.

Further, to succeed on a claim of ineffective assistance of counsel, not only must Bernard show that defense counsel's performance "fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688, 694 (1984), but he

52

must also demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Bernard cannot make such a showing because the district court's competency findings were not based upon counsel's statement, but upon its own observation of Bernard's behavior, demeanor, responses to the court's questions, and psychiatric report certifying his restoration to competency. There is every reason to believe that the district court would have conducted the same "fine-tuned mental capacity decisions" as it did concerning Bernard's competency to stand trial and represent himself at trial. Accordingly, Bernard cannot show that his counsel was ineffective.

III. JAMES' SENTENCE WAS PROCEDURALLY REASONABLE.

    A.   <u>Standard of Review</u>.

Criminal sentences are reviewed under an abuse-of-discretion standard, "which translates to review for 'reasonableness.'" <u>United States v. Mendoza-Mendoza</u>, 597 F.3d 212, 216 (4th Cir. 2010) (quoting <u>United States v. Booker</u>, 543 U.S. 220, 261-62 (2005).

    B.   <u>Discussion of Issue</u>.

James argues that the district court did not provide sufficient explanation for the sentence imposed "even though the sentencing judge did make some statements about James and his background to justify imposition of the same sentence" imposed

prior to remand.  (Brief at 59).  This claim is not supported by the record in this case.

A sentence is procedurally reasonable if the court has properly calculated the advisory guidelines range, considered the § 3553(a) factors in relation to the defendant before it, and offered an adequate explanation of the chosen sentence.  United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009).  "Where the defendant or prosecutor presents nonfrivolous reasons for imposing a different sentence" than that set forth in the advisory guidelines, a district judge should address the party's arguments and "explain why he has rejected those arguments."  Carter, 564 F.3d at 328 (internal quotation marks omitted).  An appellate court may apply a presumption of reasonableness to a within-guidelines sentence.  Rita v. United States, 551 U.S. 338, 351 (2007).

At the resentencing hearing, defense counsel reminded the district court that in the prior sentencing hearing, he argued for a below-guidelines sentence based on the 18 U.S.C. § 924(c) count which the Fourth Circuit ultimately upheld.  (J.A. 407; see J.A. 398-99, 401).  Defense counsel asked the district court to consider sentencing James to the bottom of the guideline range on Count Five because he had been on state bond "for almost two years with no violations." (J.A. 407).  Defense counsel also argued that James had been a federal prisoner for over two years, had no write-ups during that period, and had been working to better himself.  (J.A.

54

407). However, in response to defense counsel's arguments, the district court stated that James possessed 800 pounds of marijuana and possessed a firearm in conjunction with drug trafficking; that he had no employment history; that there was no W-2 on file evidencing employment; that he possessed a 2008 Infinity G37 vehicle with a tax value of $30,500, for which he put down an $8,000 deposit in the absence of employment; and that wrappers for 200 pounds of "pot" were found in the cooler in James' vehicle. (J.A. 408-09). The district court further explained that James' lack of employment and purchase of the vehicle indicated that he had been "involved in the drug business for quite some time." (J.A. 410). The district court found that James' "lack of work history [was] within the contours of a drug dealer's lifestyle," and that there was information from three trial witnesses that James had "trafficked in a considerable amount of . . . marijuana." (J.A. 411). The district court found James to be "a large drug dealer" based on the evidence that was presented at trial. (J.A. 412). These statements show that the district court considered defense counsel's arguments that the defendant essentially turned his life around after having spent two years in a controlled prison setting, and rejected them. The district court's observations reflect its beliefs that the defendant's good behavior did not warrant a sentence at the low end of the guidelines range given the extent of the drug trafficking

activities in which he had been engaged, and out-weighed the short period of time in which he had been incarcerated.  In imposing a 63 month sentence on Count Five, the district court provided a well-reasoned, thoughtful explanation for choosing a sentence at the top of the advisory guidelines.  Thus, the district court provided an adequate statement of reasons for the sentence it imposed. Accordingly, the sentence was procedurally reasonable.

IV.   DEFENSE COUNSEL WAS NOT PLAINLY INEFFECTIVE WHEN HE DID NOT REQUEST A BELOW-GUIDELINES SENTENCE AND WHEN HE DID NOT REQUEST A DOWNWARD VARIANCE.

   A.   Standard of Review.

   An ineffective assistance of counsel claim is not cognizable on a defendant's direct appeal of a criminal judgment unless the record conclusively establishes that defense counsel failed to provide effective assistance.  United States v. Baptiste, 596 F.3d 214, 216 n.1 (4th Cir. 2010); United States v. Baldovinos, 434 F.3d 233, 239 (4th Cir. 2006).

   B.   Discussion of Issue.

   James argues that defense counsel rendered ineffective assistance by failing to request a below-guidelines sentence or a downward variance based upon his post-sentencing rehabilitation. (Brief at 59).  This claim is without merit.

   Claims of ineffective assistance of counsel are not cognizable on direct appeal unless the record conclusively shows that defense counsel did not provide the defendant with effective assistance.

56

<u>United States v. Martinez</u>, 136 F.3d 972, 979-80 (4th Cir. 1998); <u>see also</u> <u>United States v. Baptiste</u>, 596 F.3d 214, 216 n.1 (4th Cir. 2010); <u>United States v. Baldovinos</u>, 434 F.3d 233, 239 (4th Cir. 2006). James did not present his claim of ineffective assistance of counsel to the district court, and he, therefore, cannot present his claim on direct appeal absent conclusive evidence in the record to support it.

An examination of the record in this case fails to show that defense counsel's assistance was ineffective. Rather, the record shows that on appeal, defense counsel launched a successful attack on James' original sentence, resulting in a remand to the district court for resentencing on Count 5. The record also shows that defense counsel realized that his original argument for a below-guidelines sentence had been effectively eliminated by the Court's affirmance of the conviction on Count 5[8]. As a consequence, he

---

[8]  <u>See</u> defense counsel's remarks to district court:

> Last time we were before Your Honor, I had argued for a below guideline sentence.
>
> I think the court had found him to be a level 24, criminal history category I, with a range of 51 to 63 months on Count Five with a consecutive mandatory 60 months to follow.
>
> And the last time I was before Your Honor, our argument was based on the 924(c) count. The Fourth Circuit has upheld that count.

(J.A. 407).

appropriately argued for a bottom-of-the-guidelines sentence rather than a downward variance, and provided the court with sound reasons for the request. (J.A. 407). The record also demonstrates that defense counsel presented arguments to the district court in an attempt to show that James was capable of financing his purchase of a vehicle with legitimate funds, that the marijuana was not found in James' vehicle, and that James lawfully owned the firearm found in his vehicle. (J.A. 410-11). Defense counsel's performance on remand, thus, does not support an ineffective assistance of counsel claim.

To succeed on a claim of ineffective assistance of counsel, "the defendant must show that his counsel's performance 'fell below an objective standard of reasonableness' in light of the prevailing professional norms." Lawrence v. Branker, 517 F.3d 700, 708 (4th Cir. 2008) (quoting Strickland v. Washington, 466 U.S. 668, 688 (1984)). If James can establish deficient performance on the part of his attorney, he must also demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. James cannot establish that his attorney's performance was deficient.

James claims his attorney was ineffective at resentencing because he failed to seek a below-guidelines or variant sentence on Count 5 of the indictment. As has already been established,

58

defense counsel's performance was anything but deficient.  This was a large-scale marijuana trafficking case and the evidence of James' involvement in it was substantial.  At resentencing, the district court observed that James was heavily involved in drug dealing based upon the evidence that was adduced at trial and based upon information contained in the PSR that showed James' purchase of an expensive vehicle, with a considerable down-payment, having no documented lawful means of support.  (J.A. 408-12).  In addition to arguing that James' post-sentence conduct had shown he was a changed person, defense counsel ably sought to show that James had access to lawful income, that he lawfully owned the firearm, and that he had not been found in possession of illegal drugs.  (J.A. 407, 410-11).  Considering the facts of the case, defense counsel's arguments for a bottom-of-the-guidelines sentence were the most reasonable ones he could make under the circumstances.  Because the record fails to support the defendant's claim of deficient performance on the part of defense counsel, the defendant cannot show that the record conclusively establishes ineffective assistance.  <u>Baptiste</u>, 596 F.3d at 216 n.1.

<u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully submits that the judgment of the district court should be affirmed.

Respectfully submitted, this 30th day of May, 2012.

                    THOMAS G. WALKER
                    United States Attorney


          BY:  <u>/s/ Yvonne V. Watford-McKinney</u>
                    YVONNE V. WATFORD-MCKINNEY
                    Assistant United States Attorney
                    310 New Bern Avenue
                    Suite 800, Federal Building
                    Raleigh, North Carolina  27601-1461
                    Telephone: 919-856-4530


JENNIFER P. MAY-PARKER
Assistant United States Attorney

Of Counsel

60

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH LIMITATIONS**

**TO BE INCLUDED IMMEDIATELY BEFORE THE CERTIFICATE OF SERVICE FOR ALL BRIEFS FILED IN THIS COURT**

1.    This brief has been prepared using (SELECT AND COMPLETE ONLY ONE):

   ___    Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman, NOT Sans Serif typeface such as Arial). Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, CG Times, 14 point):

   _____

   _X_    Twelve point, monospaced typeface (such as Courier or Courier New). Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, Courier New, 12 point):

   Corel WordPerfect x4, Courier New, 12 point.

   _____

2.    EXCLUSIVE of the corporate disclosure statement, table of contents, table of citations, state with respect to oral argument, any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains (SELECT AND COMPLETE ONLY ONE):

   ___    _____ Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

   _x_    _13821_ Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief); OR

   ___    _____ Lines of Monospaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

                                    /s/ Yvonne V. Watford-McKinney
                                    YVONNE V. WATFORD-MCKINNEY
                                    Signature of Filing Party

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

William T. Russell,
Juan A. Artega,
Jeffrey E. Baldwin & Bartlett, LLP

Counsel for Michael D. Bernard

Jorgelina E. Araneda
Araneda Law Firm

Counsel for Bradley M. James


/s/ Yvonne V. Watford-McKinney
YVONNE V. WATFORD-MCKINNEY
Assistant United States Attorney